MYER *vs.* MYER and others.

Motion to discharge writ of *ne exeat* refused, on the ground ot insufficiency of the answer and affidavits.

On motion, on bill, answer and affidavits, to discharge writ of *ne exeat.*

*Mr. A. W. Cutler,* for the motion.

*Mr. J. J. Cutler,* contra.

THE CHANCELLOR.

The complainant and the defendant, William Myer, were partners in business as butchers and dealers in meat in Morristown, under the firm of William Myer & Co., from some time in April, 1868, to the 8th of October, 1873. They were to share the profits and losses, equally. On the last mentioned day they dissolved their co-partnership by mutual consent. The business was continued by the defendants, William Myer and George W. Hunt, under the firm of Myer & Hunt. On the dissolution of the firm of William Myer & Co., William Myer, according to the bill, requested that their partnership books and accounts should be left at the store of the new firm of Myer & Hunt, and that he should be permitted to collect the money due on them. This arrangement was sought on the ground that thus the money would be conveniently collected, and that, too, without prejudice to the business. The debts of the concern amounted to about $2600. The assets, other than the money due to the firm, were divided between the partners, and they agreed that William Myer should collect the debts due the concern, (amounting, according to complainant's estimate, to about $3000,) and deposit the money in the First National Bank of Morristown, to meet the notes and obligations of the firm as they should mature, paying such debts of the firm as should

be presented to him for the purpose at the store of Myer & Hunt. The books and accounts went into his hands under this arrangement. The complainant alleges that, to his surprise, he saw an advertisement of the date of December 22d, 1873, announcing the dissolution of the firm of Myer & Hunt, and that the business would be continued by Hunt. On inquiring, he says, he found that the money due to the firm had been, to a great extent, collected by William Myer, and that he had left unpaid of the debts due from the concern about $1600, and had appropriated to his own use a large amount of the money collected by him. The complainant alleges and swears, that immediately after seeing that notice, he went to see William Myer, and asked him to account for the money he had collected, but that he refused to do so ; that William Myer then admitted he had received a large amount, but refused to say definitely how much ; that the complainant asked him what he had done with the money, and he said he had paid it to his father, who resides in Petersburg, Virginia ; that the complainant asked him to pay his part of the partnership debts, and he replied that he had nothing to pay with, and could not pay any part of those debts.

It appears that, on the dissolution of the firm of Myer & Hunt, William Myer sold out his interest in that concern to Hunt, and by agreement became a clerk of the latter in the business. His reason for selling was, he says, that he wanted money to pay his individual debts, and to raise it he sold out to Hunt. The complainant swears, that on the 2d day of January, 1874, William Myer admitted to him that he had converted all his property into money, and the complainant further swears that William Myer admitted to him, that he intended to leave this state and go to his father, in Virginia. Thomas M. Carlisle, whose affidavit is annexed to the bill, was a creditor of the firm of William Myer & Co. He came out from New York on the day last mentioned, to collect the money. He swears he saw Hunt, and that Hunt then told him that William Myer had sold out to him for $2000, and

had sent the money to his father, in Virginia, and intended to remove there himself.

The complainant swears, that he has been compelled to pay a large part of the remaining indebtedness of the firm of William Myer & Co.

The bill is filed against William Myer and his father, and George W. Hunt. It charges that they have conspired to defraud the complainant in the premises. It prays an account from William Myer. On the filing of the bill a *ne exeat* was granted. William Myer has answered. His father and Hunt have not. Motion is now made to discharge the *ne exeat* on the answer and the affidavits (among which is Hunt's) annexed to it. William Myer flatly denies that he had the conversation with the complainant on the 2d of January, 1874, and Hunt swears that he had no such conversation with Carlisle as that to which the latter testifies. Besides the affidavits of William Myer and Hunt, those of Ira M. Hurlburt and Henry H. Becker are attached to the answer. The former swears that he was in the employ of Myer & Hunt prior to the dissolution of that firm, and was cognizant of the negotiations in reference to the purchase of the interest of William Myer in the partnership, and that at no time did he hear it stated that Myer was about to leave the state, but on the contrary it was understood and agreed, that he was to remain in Hunt's employ up to April 1st, 1875. He further says, that he never heard of William Myer's intending to leave the state until he heard the complainant's bill read. He is still in Hunt's employ. Becker is a druggist, whose place of business is near that of Hunt. He swears he was present at the sale of William Myer's interest to the former, and was cognizant of the negotiations attending the sale; that he never heard of any intention on the part of William Myer to leave this state, but, on the contrary, the arrangement was, that he was to remain in Hunt's employ, and that he first learned of such intention from the bill of complaint in this cause. Both Hunt and William Myer swear that the latter has made an arrangement to con-

tinue in the employ of the former till April 1st, 1875.
Whether this arrangement was made before or after the
*ne exeat* was served, does not appear.

The answer leaves no doubt of the truth of the statement
of the bill in regard to the agreement between the complain-
ant and William Myer, on the dissolution of their copartner-
ship, the amount of the debts due from and to the concern,
or the agreement as to the books and accounts. That Wil-
liam Myer made collections upon those books and accounts is
admitted. He professes to be unable to tell to what amount,
because of the fact that the books, as he alleges, are in the
hands of the complainant.

The complainant is entitled to an account of these moneys
and of the disbursement of them. I am far from being sat-
isfied that he and Carlisle have been guilty of willful false-
hood in their affidavits—that they have deliberately sworn to
conversations (the former, to one alleged to have taken place
between him and William Myer, and the latter, to one which
he swears he had with Hunt,) which never took place at all.
On the other hand, the conduct of William Myer in the trans-
action, impresses me unfavorably. So, also, does that of Hunt.
The former had in his hands the books and accounts of
William Myer & Co., entrusted to him at his request, for
collection for the benefit of himself and the complainant.
He proceeded to make collections upon them, and as com-
plainant alleges, made large collections thereon. Very shortly
after the end of the sixty days, within which the collections
were, by the agreement between him and the complainant,
to be made, and at the end of which time an account was to
be made, and the unpaid balance of the debts to be paid off
by the partners, he sold out his interest in the business of his
new firm and became, as he says, clerk to one who was clerk
for William Myer & Co., when he and the complainant were
in partnership, and at the time of the dissolution of that firm.
His reason for this action is that he was "called on to pay
individual debts of his own, and required ready money and

means." He adds that he received the money and paid it to his creditors.

That his action in this last dissolution was sudden, and a surprise to the complainant, is not denied. It does not appear that he had been sued or threatened with suit, or that his creditors were pressing him for payment of their demands. Nor does it appear, except from the general statement above quoted, that he had any creditors. His conduct towards the complainant is suspicious and indicative of bad faith. In answering the bill he has made no effort to state the amount of his collections or of his payments, with any accuracy or attempt at exactness. His excuse is, that on "a certain day" the complainant took away the books from the store, and had them when the bill was filed. He does not allege that he requested the use of the books, to make up an account or statement for his answer, or that he had been refused the use of them, or that any necessary or desirable facility had been denied him in that connection. The case on which the writ was granted is not overthrown by the answer and its accompanying affidavits.

The motion is denied, with costs.